IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ANTHONY S. BUDA, individually, | ) | |
| BANYAN MEDICAL SYSTEMS, LLC, a | ) | |
| Nebraska limited liability company, | ) | CASE NO. 8:26-cv-99 |
| BANYAN HOLDCO I, INC., a Nebraska | ) | |
| corporation, BANYAN HOLDCO II, INC., | ) | |
| a Nebraska corporation, BANYAN | ) | |
| MEDICAL SERVICES, INC., a Nebraska | ) | |
| corporation, BANYAN MEDICAL | ) | |
| SOLUTIONS, LLC, a Nebraska limited | ) | |
| liability company, BANYAN CAPITAL I, | ) | |
| LLC, a Nebraska limited liability company, | ) | |
| BANYAN CAPITAL II, LLC, a Nebraska | ) | |
| limited liability company, SYNCONIUM, | ) | |
| LLC, a Delaware limited liability company, | ) | |
| BANYAN PLACEHOLDER, INC., f/k/a | ) | |
| BANYAN MEDICAL SOLUTIONS, | ) | |
| INC., a Nebraska Corporation, and BMS | ) | |
| AVIATION, LLC, a Delaware Corporation | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **COMPLAINT** |
| vs. | ) | **AND JURY DEMAND** |
| | ) | |
| RYAN SCOTT, individually, | ) | |
| RES VENTURES, SEZC, an entity | ) | |
| organized under the laws of the Cayman | ) | |
| Islands, OCT VENTURES, LLC, d/b/a/ | ) | |
| ELEVATE HOLDINGS, a Nebraska limited | ) | |
| liability company, RMR CAPITAL | ) | |
| ADVISORS, LLC, a Nebraska limited | ) | |
| liability company, QV FUND I, LLC, a | ) | |
| Nebraska limited liability company, | ) | |
| ELEVATE RECOVERY AND MED SPA, | ) | |
| LLC, a Nebraska limited liability company, | ) | |
| ELEVATE STRETCH AND CYRO, LLC, a | ) | |
| Nebraska limited liability company, | ) | |
| JIGSAW CAPITAL, LLC, a Nebraska | ) | |
| limited liability company, JIGSAW RED | ) | |
| HOLDINGS, LLC, a Nebraska limited | ) | |
| liability company, JRNR LLC, a Nebraska | ) | |
| limited liability company, GREENTOPS, | ) | |
| LLC, a Missouri limited liability company, | ) | |

1

GREENSTONE INVESTMENTS, LLC, a )
Nebraska limited liability company, INLINE )
CAPITAL PARTNERS, LLC, a Nebraska )
limited liability company, SFFS MASTER )
HOLDINGS, LLC,  a Nebraska limited )
liability company, MVPA, LLC, a Nebraska )
limited liability company, MED )
VENTURES, LLC, a Nebraska limited )
liability company, IA NE CONCRETE )
PULL N POUR LLC, a Nebraska limited )
liability company, CATALYSTWAVE )
CAPITAL PARTNERS, LLC, a Nebraska )
limited liability company, CATALYST )
GROWTH PARTNERS, LLC, a Nebraska )
limited liability company, PRIMEPATH )
TRUCKING AND LOGISTICS, LLC, a )
Nebraska limited liability company, )
QUANTUM VENTURES, LLC, a Nebraska )
limited liability company, BANYAN )
CAPITAL I, LLC,  a Nebraska limited )
liability company, PRIVADO, LLC, a )
Nebraska limited liability company, )
ALPINE DRONES MEDIA, LLC, an Idaho )
limited liability company, )
)
and, )
)
PRESENTLY UNKNOWN JANE/JOHN )
DOES 1-25 )
)
        Defendants. )
)
)

**PLAINTIFFS' COMPLAINT AGAINST DEFENDANTS RYAN SCOTT, *et. al.***

Plaintiffs ANTHONY S. BUDA, BANYAN MEDICAL SYSTEMS, LLC, a Nebraska

limited liability company, BANYAN HOLDCO I, INC., a Nebraska corporation, BANYAN

HOLDCO II, INC., a Nebraska corporation, BANYAN MEDICAL SERVICES, INC., a

Nebraska corporation, BANYAN MEDICAL SOLUTIONS, LLC, a Nebraska limited liability

company, BANYAN CAPITAL I, LLC, a Nebraska limited liability company, BANYAN

2

CAPITAL II, LLC, and a Nebraska limited liability company, SYNCONIUM, LLC, a Delaware limited liability company, BANYAN PLACEHOLDER, INC., f/k/a BANYAN MEDICAL SOLUTIONS, INC., a Nebraska Corporation, and BMS AVIATION, LLC, a Delaware Corporation, by and through their counsel, Michael B. Duffy, Eric W. Wells, and Heidi V. Mickelson of FRASER STRYKER PC LLO, hereby submit this Complaint praying for judgment against Defendants RYAN SCOTT, individually, RES VENTURES, SEZC, an entity organized under the laws of the Cayman Islands, OCT VENTURES, LLC, d/b/a/ ELEVATE HOLDINGS, a Nebraska limited liability company, RMR CAPITAL ADVISORS, LLC, a Nebraska limited liability company, QV FUND I, LLC, a Nebraska limited liability company, ELEVATE RECOVERY AND MED SPA, LLC, a Nebraska limited liability company, ELEVATE STRETCH AND CYRO, LLC, a Nebraska limited liability company, JIGSAW CAPITAL, LLC, a Nebraska limited liability company, JIGSAW RED HOLDINGS, LLC, a Nebraska limited liability company, JRNR LLC, a Nebraska limited liability company, GREENTOPS, LLC, a Missouri limited liability company, GREENSTONE INVESTMENTS, LLC, a Nebraska limited liability company, INLINE CAPITAL PARTNERS, LLC, a Nebraska limited liability company, SFFS MASTER HOLDINGS, LLC,  a Nebraska limited liability company, MVPA, LLC, a Nebraska limited liability company, MED VENTURES, LLC, a Nebraska limited liability company, IA NE CONCRETE PULL N POUR LLC, a Nebraska limited liability company, CATALYSTWAVE CAPITAL PARTNERS, LLC, a Nebraska limited liability company, CATALYST GROWTH PARTNERS, LLC, a Nebraska limited liability company, PRIMEPATH TRUCKING AND LOGISTICS, LLC, a Nebraska limited liability company, QUANTUM VENTURES, LLC, a Nebraska limited liability company, BANYAN CAPITAL I, LLC,  a Nebraska limited liability company, PRIVADO, LLC, a foreign limited liability

3

company, ALPINE DRONES MEDIA, LLC, an Idaho limited liability company, and PRESENTLY UNKNOWN JANE/JOHN DOES 1-25, for judgment against said Defendants, jointly and severally, in an amount no less than $73.9 million, exclusive of interests; treble damages pursuant to 18 U.S.C. §1964(c); attorney fees and costs pursuant to 18 U.S.C. §1964(c); and such other and further relief as this Court may deem just and proper to remedy Defendants' violations of the RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961 *et seq*. In support of this Complaint, Plaintiffs allege and state as follows:

## PARTIES

1.     Plaintiff Anthony S. Buda ("Buda") is a resident of Douglas County, Omaha, and the State of Nebraska.

2.     Plaintiff Banyan Medical Systems, LLC ("Banyan") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

3.     Plaintiff Banyan Holdco I, Inc. ("Banyan Holdco I") is a corporation organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

4.     Plaintiff Banyan Holdco II, Inc. ("Banyan Holdco II") is a corporation organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

5.     Plaintiff Banyan Medical Services, Inc. ("Banyan Medical Services") is a corporation organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

6.    Plaintiff Banyan Medical Solutions, LLC ("Banyan Medical Solutions") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

7.    Plaintiff Banyan Capital I, LLC ("Banyan Capital I") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

8.    Plaintiff Banyan Capital II, LLC ("Banyan Capital II") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

9.    Plaintiff Synconium, LLC ("Synconium") is a limited liability company organized under the laws of and registered to do business in the state of Delaware.

10.    Plaintiff Banyan Placeholder, Inc. f/k/a Banyan Medical Solutions, Inc. is a corporation organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

11.    Plaintiff BMS Aviation, LLC is a limited liability company organized under the laws of and registered to do business in the state of Delaware.

12.    Defendant Ryan Scott ("Scott") is an individual who at all times relevant hereto was a resident and citizen of the state of Nebraska. Defendant Scott was formerly the Chief Financial Officer (CFO) and General Counsel for Plaintiff Banyan.

13.    Defendant Res Ventures, Sezc, ("Res Ventures") is an entity organized under the laws of the Cayman Islands, and upon information and belief, was an active entity at all times relevant to the facts and circumstances set forth in this Complaint.

14.    Defendant OCT Ventures, LLC ("OCT"), d/b/a/ Elevate Holdings ("Elevate") is a limited liability company organized under the laws of the State of Nebraska with its principal place of business in Omaha, Nebraska.

15.    At all times relevant to the facts and circumstances set forth in this Complaint, Defendant RMR Capital Advisors, LLC ("RMR") was a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

16.    At all times relevant to the facts and circumstances set forth in this Complaint, Defendant QV Fund I, LLC ("QV Fund") was a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

17.    Defendant Elevate Recovery and Med Spa, LLC ("Elevate Recovery") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

18.    Defendant Elevate Stretch and Cryo, LLC ("Elevate Stretch") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

19.    Defendant Jigsaw Capital, LLC ("Jigsaw") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

20.    Defendant Jigsaw Red Holdings, LLC ("Jigsaw Red") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

6

21.    At all times relevant to the facts and circumstances set forth in this Complaint, Defendant JRNR, LLC ("JRNR") was a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Elm Creek, Nebraska.

22.    Defendant Greentops, LLC ("Greentops") is a Missouri limited liability company organized under the laws of and registered to do business in the state of Missouri and with its principal place of business in Greentops, Missouri.

23.    Defendant Greenstone Investments, LLC ("Greenstone") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

24.    At all times relevant to the facts and circumstances set forth in this Complaint, Defendant Inline Capital Partners, LLC ("Inline") was a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

25.    Defendant SFFS Master Holdings, LLC ("SFFS") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

26.    Defendant MVPA, LLC ("MVPA") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

27.    Defendant Med Ventures, LLC ("Med Ventures") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

7

28.    Defendant IA NE Concrete Pull N Pour, LLC ("Pull N Pour") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Bellevue, Nebraska.

29.    At all times relevant to the facts and circumstances set forth in this Complaint, Defendant Catalystwave Capital Partners, LLC ("Catalystwave") was a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

30.    At all times relevant to the facts and circumstances set forth in this Complaint, Defendant Catalyst Growth Partners, LLC ("Catalyst Growth") was a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

31.    Defendant Primepath Trucking and Logistics, LLC ("Primepath") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

32.    At all times relevant to the facts and circumstances set forth in this Complaint, Defendant Quantum Ventures, LLC ("Quantum") was a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

33.    Defendant Banyan Capital I, LLC ("Banyan Capital I") is a limited liability company organized under the laws of and registered to do business in the state of Nebraska with its principal place of business in Omaha, Nebraska.

34.     Upon information and belief, Defendant Privado, LLC ("Privado") is or was a limited liability company organized under the laws of the State of Nebraska and registered to do business in the state of Nebraska with its principal place of business in Nebraska.

35.     At all times relevant to the facts and circumstances set forth in this Complaint Defendant Alpine Drones Media, LLC ("Alpine") was an Idaho limited liability company organized under the laws of and registered to do business in the state of Idaho with its principal place of business in Idaho.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 3 §1331 because this civil action arises under the laws of the United States, namely, the RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, or "RICO", 18 U.S.C. § 1961 *et seq.*

37.     This Court has personal jurisdiction over Defendants who reside in or have their principal place of business within this judicial district. This Court also has personal jurisdiction over Defendants whose principal place of business is not within this judicial district because they have transacted business and/or supplied goods or services in Nebraska. In addition, personal jurisdiction over Defendants complies with the Constitutions of Nebraska and the United States.

38.     This Court is the proper venue for this action because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this judicial district. 28 U.S.C. § 1391(b)(2).

9

## BACKGROUND FACTS

### Banyan Medical Systems, LLC

39.    Banyan is a privately held healthcare technology and virtual nursing company headquartered in Omaha, Nebraska. Banyan is a mid-sized enterprise employing hundreds of employees.

40.    Anthony Buda ("Buda") founded Banyan in 2006, initially focused on procedural services to hospital clients. As founder and CEO, Buda  is a seasoned senior executive with extensive experience leading strategic product development from early-stage concept through established virtual healthcare and technology operations.

41.    Banyan's initial purpose was to provide procedural services to hospitals and other healthcare providers. In 2017, Banyan brought virtual nursing to the market and established itself as one of the earliest and most experienced providers in this evolving healthcare delivery model.

42.    For more than fifteen years in healthcare, Banyan partnered exclusively with hospitals and health systems to design, implement, and scale enterprise-grade virtual nursing programs. Banyan is not simply a staffing vendor; they are a strategic virtual care partner. Banyan provides an integrated technology ecosystem and a proven staffing model and enterprise implementation methodology to enable health systems to modernize care delivery while improving clinical outcomes, workforce sustainability and financial performance. In 2016, Banyan reorganized to change from a Nebraska corporation to a Nebraska limited liability company.

43.    Banyan's clients range from community hospitals to complex academic and tertiary care systems, including facilities exceeding 700 beds. Banyan is able to operate

10

effectively within large, high-acuity environments requiring operational sophistication, clinical rigor and measurable performance outcomes. To support sustainable, high-impact virtual care, Banyan developed an integrated ecosystem of proprietary platforms and services, to wit:

a.    "BanyanConnect" is a secure, enterprise-grade care coordination platform that integrates seamlessly with leading EHR systems such as EPIC. BanyanConnect enables real-time communication, task management, and collaboration among bedside nurses, virtual clinicians, and interdisciplinary teams, enhancing workflow efficiency while preserving clinical continuity.

b.    "BanyanOutcomes" is a comprehensive analytics and performance intelligence solution delivering real-time dashboards, ROI measurement, operational benchmarking, and actionable clinical insights. BanyanOutcomes works to empower leadership teams to make data-drive decisions that improve patient outcomes, workforce efficiency, and financial performance.

c.    "BanyanStaffing" is a scalable staffing model that provides experienced, credentialed virtual nurses, and safety companions. The rigorous recruitment onboarding and credentialing process ensures clinical excellence, regulatory compliance, and continuity of care across all supported units.

d.    "BanyanBridge" is a secure and resilient technology framework that integrates virtual nursing services within existing hospital infrastructure. BanyanBridge ensures reliable connectivity, cybersecurity safeguards, and interoperability across care environments.

e.    "BanyanSolutions" is a structured implementation and change management methodology that supports health systems from strategic planning through

11

full operational maturity. BanyanSolutions provides executive alignment, workflow redesign, stakeholder engagement, and ongoing optimization to ensure long-term program success.

44.    From approximately 2020 to 2022, Buda stepped away from day-to-day leadership of Banyan to focus on separate business endeavors. He subsequently returned to active leadership in 2022 and resumed oversight of the company's strategic direction and operations.

## Membership Structure

45.    Under the Operating Agreement ("Agreement") of Banyan, made effective December 14, 2016, Banyan is structured as a manager-managed limited liability company. The business and affairs of the Company are directed and managed by its Board of Managers, subject only to authority expressly reserved to the Members.

46.    The Agreement establishes that the company initially authorized 100,000 membership units, all of which are voting units.

47.    The Board of Managers consists of five managers, which are appointed by the members.

## Board Authority and Required Member Consent

48.    While the Board of Managers possesses broad authority to manage and control the company's business and affairs, the Agreement imposes express limitations on that authority. Certain fundamental corporate actions require specific member consent in addition to board approval. These actions include changing the principal business of the company or any subsidiary; selling substantially all of the company's assets; effecting mergers or reorganizations; redeeming or repurchasing membership units; undertaking voluntary dissolution or winding up;

12

filing for bankruptcy or insolvency protection; and amending governance documents in a manner that adversely affects specified member rights, as outlined in Section 4.04(a) through (o).

49.     These provisions establish that the board's authority is contractually limited and that extraordinary corporate actions require compliance with the consent mechanisms set forth in the Agreement.

## Limitation on Authority, Including C-Suite Executives and Officers

50.     The Agreement expressly provides that no member, officer, employee, or other agent of the company shall have any authority to bind the company in any way, to pledge its credit, or render it liable for any purpose, as set forth in Section 4.06. Any member, officer, employee, or other agent who takes any action or binds the company in violation of Section 4.06 shall be solely responsible for any loss or expense incurred by the company as a result of the unauthorized action and shall indemnify and hold the company harmless with respect to a loss or expense.

51.     Any C-suite executive or officer does not possess independent authority to bind the company merely by holding that title. Any material action taken by a c-suite executive or officer, including entering into financing arrangements, executing contracts, pledging assets, granting security interests, selling assets, issuing equity, or otherwise obligating the company, must be authorized in accordance with the governance structure established in the Agreement, as set forth in Section 4.04(a) through (o). Actions taken outside the scope of properly delegated authority constitute unauthorized acts, as set forth in Section 4.06. Any individual who purports to bind the company without proper authorization is personally responsible for any resulting loss or expense incurred by the company, as set forth in Section 4.06.

13

**Effect of Unauthorized Acts**

52.     The Agreement creates a structured hierarchy of authority. Members lack inherent authority to bind the company. Management authority resides in the Board of Managers. C-suite executives and officers may act only within authority properly delegated by the board and consistent with the Agreement. Certain material corporate actions require member approval in addition to board action. Unauthorized acts purporting to bind the company are outside the scope of authority granted under the company's governing document.

53.     Accordingly, any contract, financing instrument, security agreement, asset transfer, or other binding obligation executed by a C-suite executive or officer without proper board authorization and, where required, member consent, would be outside the scope of authority granted under the Agreement and therefore unauthorized.

**Ryan Scott's Employment with Banyan**

54.     In 2007, Scott's first year with Banyan, he incorporated Banyan Medical Systems, Inc. Up and until 2017, Scott had a limited role with Banyan and did not participate in the company's day-to-day activities. In 2017, Scott became the acting Chief Finance Officer, and served as general counsel. In 2019, Scott transitioned to a full-time role with the company as Chief Legal and Chief Financial Officer. In addition to his full-time role, Scott also served as acting Chief Executive Officer from approximately May 2020 through November 2022 while Buda stepped away to focus on separate business ventures and to care for his ailing father, Anthony Buda, Sr. ("Buda, Sr."). Buda Sr. owned and operated his own accounting practice, Tony D. Buda, P.C., which handled Banyan's accounting until his sickness in 2022.

55.     After Buda stepped away from Banyan, Scott severed the relationship with Tony D. Buda, P.C. and transitioned accounting operations internally to Banyan. Because of this, Scott

14

had full oversight and control over all key accounting decisions of the company as CEO and CFO.

56.     During the period while Buda was away from Banyan, Scott exploited his position as acting CEO and CFO, and upon information and belief, initiated the start of his fraudulent activities within the company.

57.     When Buda returned to Banyan in a full-time capacity in or around October 2022, he quickly identified a dramatic shift in the company's overall financial condition, beginning with a significant increase in payroll expenses. In an effort to stabilize and correct the situation, Buda onboarded a robust C-suite leadership team to restore operational control within the organization.

58.     Scott was acting as general counsel, CFO, acting CEO, and running the day-to-day operations of Banyan upon Buda's return. Scott's general duties during this time included managing Banyan's cash flow, monitoring Banyan's financial operations, providing general legal advice and counsel to the company, and assisting with regulatory/compliance issues.

59.     As Buda began reintegrating into Banyan, he identified several questionable business decisions made by Scott, including but not limited to: increase in payroll expenses by nearly threefold, excessive and nonessential investments in technology including the purchase of hundreds of PCs, and the execution of unnecessary real estate transactions.

**Ryan Scott Admits to Fraud**

60.     On or about September 21, 2025, Scott provided a verbal and written admission to Buda detailing how he misappropriated funds from Banyan. He admitted to stealing no less than $35,000,000.00 from Banyan over at least a three-year period.

15

61.     On or about September 23, 2025, Scott personally delivered the following written correspondence to executive members at Banyan's office, admitting to his fraudulent acts:

Tony,

I wanted to provide you some updates. I have requested both a funding history, as well as an open balance summary from Dext. I will pass those along once received. I will also send you the promissory note and pledge agreement I mentioned in my email so all of my debt to you and Banyan is properly papered and as secure as possible. Lastly, I will send you a comprehensive email outlining what I am currently working on and all of the contact information you will need.

Thank you for allowing me to come in this morning and work through some stuff. I know me being here is difficult for you, so I will make other short-term arrangements. I will still be doing everything I can to assist wherever is needed.

This has been the hardest 6 day stretch of living imaginable. Not only have I created myself a situation where there is no viable path forward for myself, but I have also put myself in a position where the one friend I have had over these years, and the company that I have worked so hard to make successful over the years, now both view me as an enemy. That is very difficult to accept. I will say that your text this morning where you forgave me was the one beacon of light I have experienced. I know that is the Christian in you saying that and that you're nowhere close to actually feeling it, but it was still meaningful.

That said, I am obviously having some very dark thoughts. I do not tell you that for sympathy – I deserve none. I have dug my own grave and deserve to sleep in it. I am going to devote 100% of my efforts for as long as I have left to getting you back as much money as possible and doing everything I can to solidify Banyan's cash position so it can move forward and its investors can be protected. If and when a decision on my future is made, I do want to sit down with you and discuss that because I can see a situation where me not being here and owning up to my actions across the spectrum (and taking sole responsibility for everything) could provide you and Banyan some cover. It's the least I could do.

One thing I do want to say, and it's in no way a justification of my actions, is that yes, I have taken a lot of money over the years. However, since October 1, 2024, when money became a real challenge for Banyan, I have only taken a net $2,166,857. That is meaningless and of no value to you other than I want you to know that I was not draining the accounts when Banyan was on the ropes and putting everyone and everything in jeopardy. I took money when we had it, and to the best of my ability, gave it back when we didn't. Again, please do not take that as a justification of any sorts. It is just important for me to say so you don't feel like I was being flippant towards you and our investors or how I view you as a friend.

Lastly, I am going to take your advice and reach out to Ben to see if he can help me navigate this time in my life through God. That's long overdue for me.

Thank you again for everything. I am a flawed man and I apologize to my depths that I have let those flaws impact your life.

16

62.     Scott admitted he diverted portions of contract financing proceeds into a separate Banyan account that he personally controlled, and that Buda had no knowledge of. In other instances, he diverted entire fundings and represented that the money was used to buy out other finance company contracts.

63.     On or about September 24, 2025, Scott sent the following email correspondence to Buda admitting to the "misappropriation" and theft of Banyan funds, in an amount he approximated to be $37,000,000.00:

| | |
|---|---|
| **From:** | Ryan Scott <rscott@banyanmed.com> |
| **Sent:** | Wednesday, September 24, 2025 11:01 AM |
| **To:** | Tony Buda |
| **Subject:** | Confidential |

Tony – As a follow up to our conversation this morning, I wanted to provide you with some additional information on how I misappropriated certain funds from Banyan. The actions were taken primarily through some actions taken by me with our finance partners. With respect to most of the funds, I diverted a portion of contract financings into a separate Banyan account I controlled. The impact for Banyan related to those actions, were that Banyan believed it owed less money to finance companies than it actually did. Additionally, when in Banyan's eyes those contracts had been paid off and funds should start coming into Banyan, the customer payments were still owed to the finance company. So this created a cash shortfall for Banyan. My plan was to repay the funds to Banyan as they came due to conceal that the payments were still going to the finance company. I was able to do that for a period of time, but as uncovered recently, there still is a substantial amount owed to the finance companies. In a couple of other instances I diverted entire fundings into my account and told you the money had gone to the buy-out of another contract owned by a different finance company. These actions again both caused Banyan to believe its liabilities to finance companies were smaller than they actually were, and also created a situation where Banyan was missing cash it was counting on to come in. Almost all of my actions were taken several years ago, but the bill for those actions has recently started to come due.

In all, I owe the company around $21M. A large chunk of that was misappropriated in 2022, but again, because the payments I misappropriated came at the end of the contracts, those amounts are now coming due. All of that is certainly not owed at once and the pay-off can be manageable, but there is no doubt that my actions have created a short-term cash flow problem for Banyan.

As has always been my plan, I fully intend to repay Banyan. I have a plan that I can execute on to repay you just north of $16M but will need a little time to effectuate it. Thereafter, I will issue Banyan a promissory note for the remainder. I will see to it that every cent is repaid.

Words cannot express how remorseful I am. The hardest part for me is that I have dedicated my professional life and spent countless hours doing everything I could to seeing this company be successful. It's very hard for me to accept that all of those efforts will be washed away by the few actions I took several years ago. That is a pain I'm not sure will ever go away.

I will keep you updated on repayment efforts and timing and of course will continue to do anything asked to help transition my responsibilities over to others.

Ryan Scott
Chief Business Officer
Banyan Medical Systems
8701 F Street|Omaha, NE 68127
o. 402.384.7510 | c. ▮▮▮▮▮▮▮▮
f. 402.339.4211

18

64. On or about September 24, 2025, Scott, apparently realizing that the scope and magnitude of his fraud had been uncovered, and understanding the widespread consequences of his actions, sent the following text to his father-in-law:



65.   After Scott admitted to his fraud, Buda and Banyan conducted an investigation into the company's finances, including requesting full accountings from multiple lenders of Banyan's, reviewing transactions undertaken by Scott, and contacting vendors regarding the admitted fraudulent activity. Buda also contacted the Federal Bureau of Investigation ("FBI") on or about October 3, 2025, regarding Scott's fraud.

66.   Buda and Banyan's investigation thus far has revealed that Scott undertook the following fraudulent acts, including but not limited to:

a.   Executed operating agreements in Banyan's name in order to open multiple bank accounts without authorization.

b.   Misused Buda's signature stamp to execute documents and facilitate numerous unauthorized and fraudulent transactions. Below is a photo of said stamp that Scott had unfettered access to during his tenure at Banyan:



c.       On or about February 7, 2023, Scott entered into a Memorandum of Assignment with DEXT Capital, LLC, for a contract purported to be with HonorHealth, with a contract price of $8,025,680.63. While HonorHealth is a legitimate client of Banyan's, the contract package associated with Scott's transaction has been confirmed as fraudulently entered into by Scott. The contract contains signatures purporting to be those of Kim Post, EVP and Chief Operations Officer for HonorHealth, however, HonorHealth has confirmed these are forgeries. Discovery of this fraudulent contract and related assignment ultimately resulted in HonorHealth cancelling the legitimate services agreement that was previously in place with Banyan, costing Banyan $2,152,045.50 due to the cancelled contract. Further, the cancellation of the legitimate agreement also led to potential losses of contract renewal at $7,747.362.80 and the opportunity for future expansion with HonorHealth. Scott executed the fraudulent transaction documents using the stamped signature of Buda without authorization.

d.       On or about September 30, 2024, Scott entered into a Memorandum of Assignment with DEXT Capital, LLC, for a contract purported to be with Southwest General Hospital. Again, Scott executed that fraudulent transaction document by using the stamped signature of Buda without authorization. Discovery of this fraudulent contract and related assignment ultimately resulted in Southwest General Hospital cancelling the legitimate services agreement that was previously in place with Banyan, costing Banyan $2,808,000.00 as a result of the cancellation of the existing contract, and a loss of potential future income of $7,776,000.00.

e.       On or about July 28, 2023, Scott entered into a Memorandum of Assignment with DEXT Capital, LLC, a healthcare receivables financing company that

21

provides capital to service providers by purchasing or financing projected revenue streams from healthcare service contracts. The Memorandum of Assignment referenced an alleged contract with Baptist Healthcare System, Inc. ("Baptist") and reflected a transaction value of $3,330,004.12. Banyan has no record of executing any contract with Baptist. The documents provided by DEXT do not correspond to any agreement contained within Banyan's official contract records, nor were they approved or executed through Banyan's standard contracting process. Baptist's Associate General Counsel subsequently confirmed that the document circulated in connection with the transaction contained forged Baptist signatures. Scott executed the transaction documents using the stamped signature of Buda without authorization.

f.    Directly due to the multiple incidents of fraud of Scott, existing and long-term client Union Health cancelled their contract with Banyan, resulting in a loss of potential future income of $12,496,680.00.

g.    Directly due to the multiple incidents of fraud of Scott, existing and long-term client Huntsville cancelled their contract with Banyan, resulting in a loss of short term income of $1,938,888.00 and potential future income of $40,000,000.00.

h.    On or about December 18, 2024, Scott transmitted an email from his email account to Heath Paulsen ("Paulsen"), Chief Financial Officer of Westside State Bank. In that email, Scott requested that Paulsen, acting in his capacity as Chief Financial Officer, provide written certification of a Personal Financial Statement prepared by Scott. The Personal Financial Statement materially overstated the value of Scott's ownership interest in Banyan. Paulsen subsequently responded to Scott from his Westside State Bank business email account and provided a letter titled "Ryan Scott BS review letter," which

22

claimed to review and certify the financial information contained in Scott's Personal Financial Statement.

i.      On or about September 26, 2025, Scott fraudulently signed debt agreements with Westside State Bank on behalf of Banyan, fraudulently purporting to be the managing member of Banyan, who in reality was Buda. This was done without the consent, authorization, or approval of Buda or Banyan. Below is a photo of the fraudulent signature page of that Debt Modification Agreement entered into by Scott with Westside State Bank on or about September 26, 2025:

j.      On about February 14, 2020, Scott engaged in a fraudulent transaction where shares of Banyan Holdco I, Inc., and Banyan Holdco II, Inc., stock were sold to an individual named Benjamin Snyder. Scott neither owned those shares of stock nor was he

23

authorized to sell those shares. Instead, the shares were owned by the members of Banyan

Holdco I, Inc., and Banyan Holdco II, Inc., who did not authorize the sale of those shares.

k.      Upon information and belief, Scott utilized company funds to pay for the

rent of an individual on OnlyFans that Scott was communicating and presumably had a

private relationship with, without the consent or authorization of Buda or Banyan. It is

estimated that Scott paid for this individual's rent damaging Banyan in an amount no less

than $14,250.00. Below is a photo of an email from Scott requesting that these funds be

transferred from Banyan to an account based in Hollywood, California:

**From:** Ryan Scott <rscott@banyanmed.com>
**Sent:** Friday, January 13, 2023 9:37 AM
**To:** Mary Mickelson <mmickelson@wsbankonline.com>
**Cc:** Hope Carr <hcarr@wsbankonline.com>
**Subject:** OCT Wire

**EXTERNAL EMAIL**

CAUTION:This email originated from outside of the organization. Do not click links, open attachments or forward unless you recognize the sender and know the content is safe.

Hi Mary – I need to send the following wire out this morning from my OCT account:

Amount: $14,250
Purpose: Rent Advance (BW)

William Green

Account: ████████6814
Routing: ████████

First Entertainment Credit Union
PO Box 100
Holly wood, CA 90078
888-800-3328

**Ryan Scott**
Chief Financial Officer and Chief Legal Officer
Banyan Medical Systems
8701 F Street|Omaha, NE 68127

24

67.     Each of the aforementioned acts were taken without authorization and without the knowledge of Buda, Banyan, or the Board, in direct violation of the Agreement.

68.     Upon information and belief, Scott took other fraudulent acts on behalf of the company that are not yet known or are not yet discoverable by Buda or Banyan.

69.     As a result of these actions, Banyan was led to believe that its liabilities to finance companies were much lower than they were. Contracts were internally reflected as paid off, when in reality, there was a significant amount of customer payments that remained due and owing to multiple lenders, including but not limited to Westside State Bank, Five Points Bank, Bank of America, Commerce Bank, First Interstate Bank, I3 Bank, Great Plans State Bank, Regent Bank, Key Bank, Banker's Bank, Security Bank and Trust Company, Simmons Bank, US Bank, First Entertainment Credit Union, Charles Schwab, Merril Lynch, Coinbase, and Chase Bank (collectively, "Lenders").

70.     Scott's theft of business assets and fraud distorted key financial records and Banyan's true financial position. This created a material cash shortfall that was undiscoverable by Buda and others because transactions were intentionally obscured by Scott, resulting in his extensive fraud to go uncovered by Banyan and Buda for years.

71.     Scott admitted that he stole at least $37,000,000.00 from Banyan dating back to at least 2022, though Banyan estimates this amount is significantly higher.

72.     Scott offered to execute a promissory note whereby he agreed to reimburse Banyan the total sum of funds he misappropriated. He purportedly executed this note on September 26, 2025.

73.     Scott's fraud was committed by utilizing unauthorized and forged contract documents that were in turn sold to multiple financing companies. Several contract packages

25

were discovered by Buda that contain his stamped signature on financing, amendment, and assignment documents without his authorization or approval. These stamped signatures gave the appearance that Banyan, by and through Board approval, had formally executed and consented to these transactions—when in fact they had not.

### Discovery of Fraud by Banyan

74.     On or about September 19, 2025, Buda was meeting with Torrey Robb ("Robb"), Banyan's current CFO, when the topic of Scott's personal loans to the company arose, as Scott had been "loaning" Banyan money over the prior several months.

75.     When Buda asked to review the source and amounts of those funds, Robb pulled up an account titled "Banyan Medical Systems" that was not held at the company's primary banking institution, Great Plains State Bank. The account was instead maintained at Westside State Bank, where Scott had established multiple bank accounts in Banyan's name. Buda immediately contacted Westside State Bank to determine how the accounts had been opened. Westside State Bank stated it was provided copies of operating agreements that were later determined to be fraudulent.

76.     Separately, Banyan requested a full accounting of fundings from its lenders, and cross-referenced those amounts against deposits into the company's primary operating account. That reconciliation revealed that approximately $21.2 million in lender proceeds were diverted to the Westside State Bank accounts instead of Banyan's Great Plains State Bank account, without the knowledge and approval of Banyan.

77.     When confronted with this information on or about September 21, 2025, Scott admitted that he had taken the funds. Additional information was uncovered regarding fraudulent real and personal property transactions, including a $4 million residence and a $1 million boat.

78.     Over the coming months as Banyan continued to investigate Scott's fraudulent activity, Banyan discovered that Scott applied for and was granted dual citizenship in the Cayman Islands in June of 2025.

79.     On or about September 23, 2025, Buda arrived at the office and discovered a manila envelope left for him. Inside was a written letter from Scott containing an initial confession. Subsequent emails from Scott further confirmed and addressed his fraud.

## CAUSES OF ACTION

### COUNT I – VIOLATIONS OF THE RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, *et. seq.*
### (Against all Defendants)

80.     Plaintiffs incorporate by reference Paragraphs 1-79 above as though set out herein.

81.     Defendants Scott, Res Ventures, OCT, Elevate, RMR, QV Fund, Elevate Recovery, Elevate Stretch, Jigsaw, Jigsaw Red, JRNR, Greentops, Greenstone, Inline, SFFS, MVPA, Med Ventures, Pull N Pour, Catalystwave, Catalyst Growth, Primepath, Quantum, Banyan Capital I, Privado, Alpine, and presently unknown Jane/John Does 1-25 (collectively "Defendants") constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and § 1962(c). Defendants associated for the common purpose of diverting funds from Banyan through undisclosed and unauthorized transfers to Scott and his business entities during Scott's tenure at Banyan.

82.     Defendants participated in conducting their enterprise by operating or managing the enterprise's affairs, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c) (*see* ¶¶ 60-79).

83.     Defendants knowingly, with intent to defraud Banyan, and in furtherance of their enterprise, engaged in such racketeering activity including but not limited to the following acts:

a.     Mail Fraud: The use of the United States Postal Service and private interstate carriers false financial reports and account statements, and other fraudulent documents designed to conceal his embezzlement and misappropriation of Banyan funds, in violation of 18 U.S.C. § 1341. Such use of the Postal Service was integral to executing and concealing Defendants' fraudulent scheme. (*see* ¶¶ 60-79).

b.     Bank Fraud: The execution and attempt to execute a scheme to defraud federally insured financial institutions, including but not limited to Westside State Bank, Five Points Bank, Bank of America, Commerce Bank, First Interstate Bank, I3 Bank, Great Plains State Bank, Regent Bank, Key Bank, Banker's Bank, Security Bank and Trust Company, Simmons Bank, US Bank, First Entertainment Credit Union, Charles Schwab, Merril Lynch, Coinbase, Chase, by submitting and causing to be submitted false and fraudulent financial statements, wire instructions, and certifications in the name of Banyan and other entities, in violation of 18 U.S.C. § 1344. Defendants misrepresented the purpose and authorization of transfers, thereby inducing financial institutions to release funds under false pretenses and facilitating his diversion of Banyan funds and assets for personal use. (*see* ¶¶ 60-79).

c.     Wire Fraud: The transmittal of interstate wire communications—including emails, electronic payment instructions, and interstate wire transfers—false and fraudulent representations regarding Banyan finances, payments, and internal authorizations in violation of 18 U.S.C. § 1343. These interstate wire communications

were made for the purpose of executing and concealing Defendants' scheme to defraud and wrongfully obtain money and otherwise divert assets from Banyan. (*see* ¶¶ 60-79).

d.       Money Laundering: The conduct of financial transactions involving proceeds of unlawful activity, including transferring misappropriated Banyan funds through multiple bank accounts, shell entities, and personal accounts, with the intent to conceal and disguise the nature, source, and true ownership of the proceeds to further Defendants' fraudulent scheme, in violation of 18 U.S.C. §§ 1956-1957. (*see* ¶¶ 60-79).

e.       Embezzlement: The misappropriation of Banyan's assets for Defendants' own benefit and for the benefit of entities they controlled, without authorization and in breach of his fiduciary duties to Banyan, in violation of 18 U.S.C. § 641. (*see* ¶¶ 60-79).

f.       Forgery: The falsification of financial instruments and other legal documents through the use of signature stamps in order to facilitate unauthorized disbursements to Defendants and further conceal the diversion of company funds. (*see* ¶¶ 60-79).

g.       Theft: The unlawful taking and exercise of control over Banyan property with the intent to permanently deprive Banyan of such property, including by redirecting corporate funds into personal accounts or entities solely under Defendants' control. (*see* ¶¶ 60-79).

84.    The racketeering activity conducted by Defendants constituted a pattern by including at least two predicate acts within a ten-year period as defined by 18 U.S.C. § 1961(5).

85.    Plaintiffs were injured in their business and property due to Defendants' violations of 18 U.S.C. § 1962, as described above in the amount no less than $73.9 million, exclusive of interests, costs, attorney's fees, and expenses.

**COUNT II – CIVIL RACKETEER-INFLUENCED AND CORRUPT
ORGANIZATIONS ACT CONSPIRACY, 18 U.S.C. § 1962(d)**
**(Against all Defendants)**

86.     Plaintiffs incorporate by reference Paragraphs 1-85 above as though set out herein.

87.     As alleged in Count I, Defendants Ryan Scott, Res Ventures, OCT, Elevate, RMR, QV Fund, Elevate Recovery, Elevate Stretch, Jigsaw, Jigsaw Red, JRNR, Greentops, Greenstone, Inline, SFFS, MVPA, Med Ventures, Pull N Pour, Catalystwave, Catalyst Growth, Primepath, Quantum, Banyan Capital I, Privado, and Alpine violated 18 U.S.C. § 1962(d).

88.     Defendants conspired in and among themselves, and with Defendants presently unknown Jane/John Does 1-25 to participate, directly or indirectly, in the conduct of the affairs of the enterprise (*see* ¶¶ 78-82) through a pattern of racketeering activity (*see* ¶¶ 57-70, 80) in violation of 18 U.S.C. § 1962(d). In particular, Defendants intended to or agreed to further an endeavor of Scott which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. 1962(c)), and adopted the goal of furthering or facilitating the criminal endeavor.

89.     Plaintiffs were injured by Defendants' overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included, mail fraud, bank fraud, wire fraud, money laundering, embezzlement, forgery, and theft (as described in ¶ 80(a)-(g) above), committed through the enterprises alleged in Count I.

90.     As a direct and proximate result of, and by reason of, the activities of Defendants and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiffs were injured in their business and property, within the meaning of 18 U.S.C. § 1964(c). Among others, Plaintiffs suffered damages as a result of Defendants' fraudulent transfers; delay and loss in the use, enjoyment, benefits, profits, revenues, interest and interests and delay and loss of opportunity to execute on

30

and recover against the property fraudulently transferred and/or encumbered; damage caused by waste, loss, plunder, and devaluation of the assets transferred by Defendants; attorney fees and costs resulting from their acts; interference with family relationships and economic benefits of family; and all other damages, injuries, and harms caused by the fraudulent transfers and interference.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs demand judgment against Defendants, jointly and severally, in an amount no less than $73.9 million, exclusive of interests; treble damages pursuant to 18 U.S.C. §1964(c); attorney fees and costs pursuant to 18 U.S.C. §1964(c); and such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial in Omaha on all issues raised by this Complaint and hereby provides notice to Defendants of such.

Dated this 6th day of March, 2026.

ANTHONY S. BUDA, individually, and BANYAN MEDICAL SYSTEMS, LLC, a Nebraska limited liability company, BANYAN HOLDCO I, INC., a Nebraska corporation, BANYAN HOLDCO II, INC., a Nebraska corporation, BANYAN MEDICAL SERVICES, INC., a Nebraska corporation, BANYAN MEDICAL SOLUTIONS, LLC, a Nebraska limited liability company, BANYAN CAPITAL I, LLC, a Nebraska limited liability company, BANYAN CAPITAL II, LLC, and a Nebraska limited liability company, SYNCONIUM, LLC, a Delaware limited liability company, BANYAN PLACEHOLDER, INC., f/k/a BANYAN MEDICAL SOLUTIONS, INC., a Nebraska Corporation, and BMS AVIATION, LLC, a Delaware Corporation,

Plaintiffs.

By:   _/s/ *Michael B. Duffy*_____
      Michael B. Duffy, #27529
      Eric. W. Wells, #23694
      Heidi V. Mickelson #28223
      FRASER STRYKER PC LLO
      500 Energy Plaza
      409 South 17th Street
      Omaha, NE  68102-2663
      (402) 341-6000
      (402) 341-8290 (Facsimile)
      mduffy@fraserstryker.com
      ewells@fraserstryker.com
      hmickelson@fraserstryker.com
      ATTORNEYS FOR PLAINTIFFS

32